Welcome to Argument Presnell v. Warden. Judge Joe Flatt is a member of this panel and he is fully participating, but he is recovering at home from a surgical procedure and will be participating by phone both in the argument, if he has any questions, and also in the conference hereafter. Having said that, Mr. King. Thank you, Your Honor. Your Honor, it's Gerald King with the Federal Defender for Mr. Presnell. The jury that sentenced Mr. Presnell to death never knew that his mother binged drank bourbon throughout her pregnancy. I didn't see in your affidavit that she binged drank throughout the pregnancy. I saw one incident in the affidavit where she drank a pint of bourbon and started on another one before somebody threw it outdoors. There is the one incident that she details in the affidavit of drinking a pint and a half. She actually gives a deposition in the State Habeas Proceedings as well in which she indicates heavy drinking about two to three times a week. I can pull that citation for you, Your Honor. But that contradicts with or at least is inconsistent with her affidavit, is it not? I think her affidavit indicates that she drinks throughout her pregnancy both with her husband and then with her. I would just have to sit at home while I was pregnant, so I would have a few drinks by myself wondering whom my husband was with. I think sometimes I drank during this period just because I was mad at Delano. That doesn't say she binged drank throughout the pregnancy. Well, again, in her deposition, I think she indicates that there are periods of heavier drinking about two to three times a week. And, again, I'm happy to pull that citation. What's the time elapsed between the affidavit and the deposition? I think the deposition would have been taken during the discovery period following the tendering of the affidavit at the completion of Petitioner's discovery. Yeah, I'd be shocked if that wasn't the chronology, but about how much time elapsed. Well, we should note that Dr. Weinstein analyzes it. You don't know how much time elapsed? I can certainly find out for you, Your Honor. I can pull it up, and if you'd like, I can give you that. No, I just couldn't tell you understood my question. Oh, apologies. I don't know, but I'll find out as a perfectly adequate answer on that. It just seems to me like this woman's story got better and better every time she told it. I think she tells the story pretty consistently, Your Honor. And the incident where she drinks the pint and a half of bourbon, we shouldn't minimize. Dr. Weinstein, in his analysis of the type of prenatal alcohol exposure that is most injurious to a developing infant, identifies instances where large quantities of strong liquor are consumed in a single sitting. So even if it were just this one instance, I don't think we could minimize the danger. I know, but you may be maximizing her story. What she actually said in the affidavit, and perhaps she expanded on it or enlarged it in the deposition, I drank the whole pint of bourbon, and then the neighbor brought me another pint of bourbon. Delano came home, and he was upset to have been drinking, and he started to jump on me. He was trying to get the bourbon bottle from me. I would not give him the bottle, and I eventually threw the bottle in the middle of the street. That doesn't say she drank half of it. I will check on that, Your Honor, but I do think in the record that she drinks about a pint and a half, that she's certainly drinking more than one pint, and more than one pint would constitute a binge drinking of a very strong drink, which again is the type of exposure that Dr. Weinstein flags as particularly injurious. I think that it remains a pretty significant fact. What did she say in the deposition about whether she had told Ms. Bovee that? I think in the deposition she indicates, and I hate to be talking so much about a document that I might be able to pull and respond to more fulsomely when I'm doing my reply. Her deposition is consistent. Yes? Why don't you just put that in the letter you're going to send? Yeah, I'd be happy to. Thank you. Yeah, rather than take your time now to flip through. I appreciate that, Your Honor. That sounds good to me. So, again, the knowledge of Mr. Presnell's organic brain injuries and the full extent to which they damaged his judgment and ability to control his behavior would have been powerfully mitigating in its own right. There are many Supreme Court cases on that point, including Rompia, which specifically addresses organic brain damage from FASD. FASD would also explain and corroborate Mr. Presnell's inability to function academically and socially to let his childhood educators to recommend his placement in a class for mentally retarded students. Let me ask you something, and I'll try to leave you alone for a few minutes anyway after this. I have a kind of macro problem with understanding this. Sure. You castigate, criticize, constructively criticize the government for suggesting through some of its experts, and it's stronger in your opening brief than in your reply brief, but suggesting through some of the experts that he was just born a pedophile. It was a genetic ideology, ran in the family, that sort of thing. It's in your opening brief. Let me finish. To the extent that was the State's theory at the resentencing, why is that less an explanation than at the time of birth, instead of having lost the genetic lottery in a colossal way, he was damaged by fetal alcohol syndrome, and that led to it? Why is the second theory that much more mitigating than the first? Your Honor, first, I think the premise of your question might be mistaken. It's not the State's experts who are suggesting that he's a pedophile genetically hardwired. That's actually their expert. That's Dr. Schaeffer's theory, is that Mr. Presnell is a pedophile because of some genetic predisposition. You're right, and the State came back and said he's just mean. Right. That's even better set up for my question. All right. Why is, if you have two theories, one is prefrontal lobe, cerebral damage, just the way the genes lined up, we all get a unique package, and he drew a bad package and was destined to be a pedophile when combined with the environmental factors that he had. That's one theory. The other theory is he didn't draw a bad genetic ticket. Instead, it was the alcohol that his mother took. But however he got there, at the moment of birth, he was the same as if he had been genetically destined to be in that shape, and then you had the environmental factors. Why is one so much more powerful mitigating evidence than the other? One blames the mother. The other blames just the genes.  All right. But if they're both presented in the best way and you're the one charged with presenting each one in two parallel trials, why is one theory better than the other? Well, I don't think we're even talking in terms of presented, and I apologize for phrasing it this way, whether it was presented in a better or worse. It's just very different. Dr. Schaffer's presentation is that— I'm sorry. You're evading my question. Not intended. Assuming that there are two theories, and you can present them, and you can present them the way you want to, why is one of those two theories better or worse than the other? I think there is something inherently mitigating to a brain injury suffered before birth because your mother poisons you with alcohol. I think that is mitigating in and of itself. Also, Dr. Schaffer's presentation—  Dr. Schaffer's presentation is that Mr. Presnell develops a pedophiliac disorder from a combination of two factors, some vulnerability or predisposition to developing inappropriate sexual behavior and exposure to a childhood which is rife with sexual dysfunction and abuse. Where the theory falls down in a way that I think steps out of just better or worse and to the point of complete failure is he can only identify as a vulnerability and relies very heavily for that vulnerability on a genetic predisposition that is debunked in trial because it is premised entirely on the molesting behavior of Virgil's maternal uncle who did not begin molesting anyone until he had suffered a head injury. I can't overstate the degree to which Dr. Schaffer relies on this genetic predisposition. He says it nine times in the first eight pages of his testimony. But even pedophiles are subject to head injury. A pedophile would be subject to a head injury, sure. Well, you said the genetic predisposition to pedophilia was totally debunked because he didn't manifest it until he had a head injury. For the paternal uncle. Right, right. That's the one we're talking about. Well, how do we know he wasn't a pedophile and just hadn't manifested it? I don't suppose there is any way to know that, Your Honor, but that's not how Dr. Schaffer is presenting it. Dr. Schaffer is pointing to James and say, and again, there are multiple, multiple references to this during his testimony. As I mentioned, there are nine in the first eight pages. He's indicating we look at genetic patterns and extended family patterns, pointing to Uncle James. He's just repeatedly reporting to Uncle James as the evidence of a genetic predisposition. And when, on cross-examination, it is pointed out to him that Virgil's maternal Aunt Lillian has testified that same day that Uncle James did not begin molesting anyone until a car accident, he completely falls apart. There's then the State's experts then get up and say, yes, there's no genetic predisposition. There's nothing in the literature to justify that. And he's certainly not qualified to speak to it. And that is the foundation. There are two pieces of mitigation that Dr. Schaffer is really trying. They're trying to present through Dr. Schaffer. One is that he has developed this pedophiliac disorder, again, by the combination of some vulnerability, genetic vulnerability is what Schaffer posits, and this exposure to a childhood that, again, is comprehensively dysfunctional sexually. There are boundaries that exist only to be transgressed. The other piece is that, and if I can say as a preamble to discussing the second piece of mitigation, Dr. Schaffer is brought in to investigate intellectual disability. Resentencing counsel says in his affidavit, when he met Mr. Presnell, he thought there's no way this case goes to trial. This guy is clearly intellectually disabled. He directs Schaffer, and Dr. Schaffer conducts the investigation that, as he informed counsel he would do, that their investigation shapes. His evaluation is shaped by their investigation. He administers a Vineland, and he administers a Waste III. And he also discovers the same scatter in Virgil's intelligence test scoring that had been noted throughout the school records. There's always a scatter. It's never fewer than 11 points. There are a lot of different explanations for a scatter. A scatter can be brain dysfunction. It can be a brain injury, or it can be a learning disability. And at this point, all of the evidence presented to Schaffer, the only indication of any kind of organic brain injury is a fall from a changing table at six weeks or the use of forceps in delivery. He does a limited, and what he says is, you only do neurological testing if there is some indication of brain injury. So he does a limited Halstead-Wright-Tan. He does not explore brain injury. So both of these pieces of evidence are each within themselves. They have two foundations. The pedophiliac disorder is founded upon the idea that there is a genetic predisposition, which, again, is unfounded either scientifically or in the facts of this case, the revelation of which is devastating to Schaffer's credibility. And with the brain injury, he says there does appear to be some brain dysfunction here. I've done this limited battery, and he showed problematic scores on two of these subtests that I administered. And the prosecution comes back, and for want of evidence of the actual source of the brain injury, which is this prenatal exposure to alcohol, all Dr. Schaffer can say, the cross-examination is, so you're saying that he has a brain injury because he fell from a table and he has trouble playing with blocks. The full scope of Mr. Presnell's prenatal brain injuries never comes into the case. There are implications for his executive functioning. The ability to control this behavior never comes in. Yes, sir. Did a – I didn't see it in the briefs.  Or in all the opinions and orders. But did any expert testify that the following are the causes of pedophilia? I'm sorry, what? Did any expert testify that the following are the causes of pedophilia, and it has to be one of these causes, colon, and then list them? I think both Dr. Weinstein and Dr. Lisak speak to that in their reports. And Dr. Weinstein – Dr. Lisak particularly lays out the risk factors for pedophilia, and that is for the development of a pedophiliac disorder, and that is certainly one of them. But Dr. Weinstein points out that – I'm sorry, I'm sorry. What is certainly one of them? A brain injury, Your Honor. Some kind of an insult to the brain does leave you vulnerable to the development. Dr. Weinstein, I think, is actually more specifically on point. He notes that FAS – in FAS, 65 percent of people with FASD manifest inappropriate sexual behavior, which covers an entire range of things, including what were – what underlies the crime in this case. And there's something about this – But no one testified, as I read – I'm sorry? As I read what you presented, no one testified that fetal alcohol syndrome is a leading cause of pedophilia, or I believe one of the experts testified that most pedophiles had been sexually molested as children. Did he not? Oh, that's Dr. Lisak, yes. That's Dr. Lisak's discussion of the psycho violence. Was there any evidence that Presnell was sexually molested as a child? There was. Dr. Lisak thought it was very likely that he had been. And two of the people with whom he was sharing a bed during his childhood were confirmed molesters of children. There was – yes? Mr. Presnell did not testify to that. No, sir, he did not. Did not submit an affidavit. No, sir. Did not tell any of the experts that. No, sir, he did not. And no one in his family testified that he had told them that. No, sir. But there was some theorizing, wasn't there? Dr. Lisak's – Dr. Lisak's opinion on this, and I will try to flip it. Not even just Dr. Lisak's. Wasn't there – I'm trying to remember who it was now, and I apologize. I think Dr. Weinstein flagged it as well. They both thought it was very likely that Mr. Presnell had been molested. But even so, I mean, even – wasn't it maybe even Dr. Schaffer had mentioned, and if I'm getting it wrong, I'm sorry, but I feel like I recall reading that there was some testimony at the second mitigation hearing about how it was very likely that he had been sexually abused as a child, that his uncle had abused his aunt and his aunt's daughter, I guess, and that it was around the same time that he was there and there was belief that he had been sexually abused at that time. Two things to that, Honor. I think – Your Honor, I think you're correct. Dr. Schaffer was – as part of pointing to this idea of a genetic predisposition, he was pointing out that James was in the house and was molesting the sisters at a time when Mr. Presnell was, I think, four or five years old. There is another piece to that which did not come in at the resentencing trial because the investigation for the resentencing trial did not speak to any members of Mr. Presnell's paternal family, which is that Mr. Presnell's father also molested his family members. So there is – and he is another person who was in and out of Mr. Presnell's life but cohabiting with him four periods of time. So that is another exposure that he had, making it, in the opinion of the experts, likely that he was molested that doesn't come up in the resentencing trial. But, yes, I think that's correct. Yet Mr. Presnell never said his father molested him. No, he did not. Then that's, as Dr. Lisak notes, that's not unusual. It's not unusual for people who have been sexually molested to deny being sexually molested. But Mr. Presnell's exposures to, I keep wanting to say sexual dysfunction while feeling that it's rather inadequate to capture the full flavor of the many horrible things to which he was exposed in childhood, contribute to that same cycle of violence, like that which Dr. Lisak talks about, where if you do have this vulnerability and here, again, 65 percent of people with FASD manifesting inappropriate sexual behavior, there is something about the nature of the injury sustained by prenatal alcohol exposure that creates this vulnerability. I think that would have been very compelling for the jury. That, combined with the childhood environment, leads to the development of this disorder. You know, it just seems a bit ironic, if not odd, that he would admit to raping two, well, raping a young girl and murdering an 8-year-old girl, but he's too embarrassed to admit that he was sexually abused when he was a child. I'm not sure a jury would have bought that theory. Your Honor, I can't speak to that. But he is very candid with the police about what he did and is quite remorseful, as evidenced by his tears during that statement and by saying he wished to God I'd never done it. The shame of being sexually abused is deep. That's something that I believe Dr. Lisak talks about. And so while Mr. Presnell was obviously and is very much to this day ashamed of what he did to these girls, he is also, I think, there's also a very strong possibility that he is ashamed of what was done to him. And that goes to sort of our overarching theme here. He's just more ashamed of what was done to him than what he did to these little girls. I think there are different kinds of shame that are accessible, and I think that when you have something for which you have to feel remorseful because of something that you did, as opposed to something that you're ashamed of that was done to you, perhaps that places a greater obligation on you to speak up and to take responsibility. So turning for a moment to the reasonableness or unreasonableness of the attorney's investigation. Yes. So Dr. Schaefer was hired for the purpose of doing, among other things, as I understood it, inquiring into parental alcoholism. Now, clearly he did not get this information from doing so, but am I mistaken in my understanding that the attorney hired him in part to inquire into parental alcoholism? So when Dr. Schaefer is first contacted by counsel in July of 1998, he sends a memo where he says, you know, these are the kinds of things that I do. These are the kinds of areas that you're going to want to investigate. And he says, I'm going to rely upon your investigations, talking with other family members, to identify things and shaping the examination. He flags a number of things in that memo, which include developmental issues during pregnancy, alcohol. He lists a number of sort of mitigating issues when he runs through that. Dr. Schaefer's examination, as it actually plays out, is focused much more on intellectual disability. And I don't know that I can, I will check. I don't know if, I might not be responding to your question, but I'm not sure that parental alcoholism is something that he would have been focused on. The alcoholism among his parents is his father, Delano, who is not investigated by resentencing counsel. He does not come into the case at all until he provides an affidavit and state habeas. And so, am I responding to your question? Looks like maybe not even a little bit. Following up a little bit, the district court said that you did not dispute that Dr. Schaefer focused on head injuries, complications during pregnancy and birth, verbal, physical, and sexual abuse, et cetera. Is that correct? I think in the end that's where he ended up. He focused on intellectual disability. And, again, he, you know, he. No, no. I ask you about, I ask you about. No, counsel. I apologize. I ask you about five things, and you said, yeah, I think that's what he did, one thing. Now, be fair. The district court said Dr. Schaefer focused on head injuries, complications during pregnancy and birth, verbal, physical, or sexual abuse, parental alcoholism, and mental and emotional problems. And he says y'all don't dispute that, y'all being the petitioner. I was not trying to dispute it then, Your Honor. I apologize. I launched into a narrative, probably ill-advisedly. I do not think that developmental issues during pregnancy or birth would be an accurate assessment of what he did, except as for the fall from the changing table and wondering whether that might have had some effect. What about parental alcoholism? I think there was some discussion of the parental alcoholism from Delano's. I understand now. I apologize. Of Delano's parental alcoholism from some of the other affiants. The full scope of that, including Delano's own affidavit about that, does not come into state until statement is made. You also don't dispute, as I understand it, that Ms. Bovee met with the mother three times at least. I think that's correct, Your Honor, yes. All right. One time went to the home, had a conversation with her about her. I'm sorry. I don't mean to interrupt you. The second time being that when she came to the motel where Mr. Bovee was staying, she questioned her there. And the third time being before trial, meeting with the lawyers. Yes. And that somewhere along the line, she asked her about her drinking during pregnancy. She asked her that during the first two meetings with her were on consecutive days in October of 1998. I think it was the 17th and the 18th. I'm not entirely sure. She then meets with her again in February. She does not memorialize that conversation until around December in a memorandum to counsel. That is where she asked a question about drinking and got an affirmative answer, yes, I did drink during my pregnancy, which she did not explore beyond that. I thought, excuse me. Yes, sir. Stick to what I understood to be what you all joined issue on. I thought her testimony was or the report was that, yes, I drank, but only socially during pregnancy. That's different from a didn't drink. Well, I agree, Your Honor. I think that the only thing that you can tell from her answer that she drank socially is that she drank, which is where we say the. . . That's not the common understanding of drank socially. When somebody says, I drink socially, I take that to mean that when they're in social occasions, they drink. Well, I think it means different things to different people, and what it means to a pregnant teenager married to an alcoholic soldier in 1953 is a different question than what it might mean for you or me. Well, where is the social component of what it means to that teenager? Of course, she's not a teenager at the time she's being interviewed. Well, I think you have to. . . No, but in this case. . . Well, in that case, a 63-year-old factory worker with some mental impairments recalling how she drank. No. When she was. . . No, you're talking about the time of affidavit. That's not the time she said, I drank socially. She said, I drank socially. When she was 63. But she's characterized. . . I thought she was interviewed by Ms. Bovee. Yes. 22 years after she had been pregnant. Am I wrong? No. Yes, Your Honor. Apologies. But Ms. Bovee, Mr. Presnell was born in 1953. Ms. Bovee interviews her in 1998. And so I believe that she's 63 at that time, which is where I came up with that age. 53 to 98 isn't 63. No, well, Mr. Presnell, she was 17 at the time, in 1953. The point is. . . Yes, sir. Before trial, Ms. Bovee interviewed her. And she said, yes, I drank, but only socially. Yes. All right. And you say that's the equivalent of saying that she was at home alone binge drinking. Oh, I think it is only the equivalent of saying, yes, I drank, and that you can't know how much or how often, the frequency or intensity, without asking follow-up questions, which is why it's a red flag. Well, suppose. . . If someone says. . . Suppose if she said, no, I didn't drink. Is that the equivalent of, yes, she drank? I mean, I don't understand how you can change a word, drink socially, a phrase, to drank. And that's all it is. But yes, I drank doesn't change as well. I don't think we're trying. . . I don't think we're trying to change the word, Your Honor. I think we're saying that you can't know what socially means without asking more questions. You really think. . . Because. . . You really think socially could mean binge drinking at home by yourself, a pint and a half of bourbon? I think that socially is limited to the experience of that person, unless you know what that person's understanding of socially is. And, again, looking back at a time where. . . Is that why you incorporated into the affidavit or are going to show us in a deposition where the mother says, of course I said I drank socially, and what I meant by that is I drank a great deal at home by myself and binge drank during my pregnancy. Is that how the mother's going to explain that answer? Well, I think the way she explains that answer is no one asks me anymore about how or what I drank until the state habeas proceedings when I was asked. And it turns out that socially for her. . . But is she going to testify, or has she already testified, the record's closed, that when I said socially, I meant I binge drank at home by myself? I don't understand. . . I just. . . You had the woman sign the affidavit. She says it's her words, although y'all typed it up far and got the grammar and the syntax arranged and all that. But you didn't have her say, when I said I drank socially, what I meant was I drank a great deal at home by myself. Your Honor, what her affidavit explains is, and what I think her interview with Ms. Beauvais shows and that affidavit shows, is she was very candid in answering the questions that she was asked, but there were no follow-up questions about how she drank. Now, when she said socially, that indicates yes. And at this point, maybe she has reluctance at that point to expand upon it. There is a line of case law saying that that does not absolve counsel of their obligation to follow up on a red flag. In this case, the red flag is, yes, I drank during my pregnancy. And unless you know how much and what, you can't assess the mitigating impact of that. There's nothing in the record to suggest that Lois was — that, pardon me, that she's now deceased, that Ms. Samples was dishonest or was evasive. She held forth at some length in the interview about some very difficult stuff about her background. Counsel, I'm taking you way past your time. I'll give you the full seven. Let's hear now from Ms. Singh. Yes, Your Honor. Thank you. Thank you. May it please the Court, my name is Chanel Singh, and I'm here on behalf of the warden appellee asking this Court to affirm the district court's denial of relief. Your Honor, the question here is whether the state habeas court's decision, that is, of no deficient performance on the part of trial counsel and no prejudice, if that is an unreasonable decision, if that's contrary to Supreme Court precedent as determined by the Supreme Court, or if it's an unreasonable determination of the facts. And, Your Honor, it's our position that this late revelation, late and inconsistent revelation of Ms. Samples' binge drinking does not undermine the quality of the investigation that was undertaken by trial counsel. Trial counsel investigated the case on their own. They interviewed Mr. Presnell. They interviewed Mr. Presnell's family members, including Ms. Samples, excuse me, and they had their experts that were recommended to them by the Multicounty Public Defender's Office who were experienced in death penalty litigation to hire both Ms. Bovee as a mitigation specialist and Dr. Schaefer as their mental health expert, their psychologist. Your Honor said that Ms. Samples' story got better and better every time she told it, and though her story got better and better, the more she was probed, the weakness of that story came about, which would have been assessed by the state habeas court in making its determination. For example, Your Honor, Ms. Samples was deposed by the warden's counsel, and Ms. Samples in that deposition does indicate what she means by socially. She was asked about her mother and father's intake of drinking, and when describing her mother's intake of drinking, she said that her mother's intake of drinking was at different times, and by that, she meant socially. That did not indicate that her mother was drinking heavily, that her mother was a binge drinker. Furthermore, Your Honor, during her pregnancy, she had stated not in her affidavit, but in her deposition that she had drank with Delano, who is Mr. Presnell's father, and in the affidavit that was obtained by Mr. Presnell's state habeas counsel, the affidavit that is of Mr. Presnell's father, Delano, he says nothing about Ms. Samples drinking while pregnant, though she was allegedly his, or excuse me, her drinking buddy. Moreover, Ms. Samples alleged in her affidavit that she had drank during her entire pregnancy, and yet when she lived with her other family members after Delano, that is Mr. Presnell's father, went to Japan, none of her family members ever witnessed her drinking, and even if she drank alone, she would have drank in the home with them. No one ever witnessed that, and clearly that late and inconsistent revelation has credibility concerns and would not have undermined the investigation undertaken by trial counsel, who specifically, through Ms. Beauvais, asked her about her pregnancy. Ms. Beauvais indicated that she had a normal pregnancy, that she smoked a pack of cigarettes during her pregnancy a week, and that she drank but only socially. Excuse me, I'd be more specific. She said she did not drink except socially, and I think that's a very telling on trial counsel noticing a red flag. I don't think that Mr. Presnell can show that no reasonable attorney would not have accepted that answer, and that wouldn't undermine the State habeas court's determination of no deficient performance. Moving on, Your Honor, not only would trial counsel have been deficient in not investigating, so not discovering this, but they also had her personally interviewed by Mr. Pennington, their fact investigator. That is, they had Ms. Samples interviewed. They had her interviewed by Ms. Beauvais, and they had her interviewed by Dr. Schaffer, and Dr. Schaffer did say that he would also look at parental alcoholism, and, Your Honor, that's on page 193 of the State habeas transcript where he said he would look at parental alcoholism. Their response to that is Dr. Schaffer meant or must have meant that I'll do that based on what they tell me, they being the State. The State, Your Honor? The trial. Yeah, the prosecutors or the defendants. Could you repeat the question, Your Honor? I'm sorry. Well, Schaffer turned out to be more, let me start over. He said I will do that based on the information that is brought to me by the defense. Yes, Your Honor. He did take into account information that was given to him by defense, but never did he indicate that was only what he was going to take into account, especially since he independently interviewed Mrs. Samples and Mr. Presnell's aunt, Ms. Lillian Shepherd. So he wasn't only restricted by what trial counsel gave him, and trial counsel also testified in the State habeas hearing that they did not restrict Dr. Schaffer's evaluation in any way. Had they asked for additional or had he asked for additional information from trial counsel, they would have provided that to him, and had Dr. Schaffer indicated that there was anything else that needed to be done, they would have followed up on that. Your Honor, also, this theory that Mr. Presnell is now alleging that Dr. Schaffer's entire testimony was about this genetic etiology of him being a pedophile and therefore he was born to injured children, that's just not supported by the record. He did say that there was a genetic basis coupled with his environment, which made him more vulnerable in combination with his brain disorder, to have behaved the way he did at the time of the crime. Again, Dr. Schaffer was not used to explain his pedophilia, but to mitigate his culpability for the events of the crime. Well, that's not necessarily inconsistent. Their theory is anything that explains why he did that, including the fact that he was turned into a pedophile in part by the mother's drinking, is mitigating, and is more mitigating than the fact that he just was born with bad genes or unlucky in the DNA lottery and had a propensity towards pedophilia to start with. That's their theory. Yes, Your Honor, but I would say that their theory is cumulative to what was presented at trial. To saying that only at trial was that he was a pedophile born that way, that's not correct. And so what they're saying, Dr. Weinstein and Dr. Lysak said, that coupled with his sexual abuse and his impoverished conditions in which he lived in at home, his abuse suffered by his father and his family members, that was also presented at trial. The jury heard that information. And they heard the information of him possibly being sexually abused by his uncle with whom he lived. They heard information about him possibly being sexually abused by a minister for a halfway house that he was in. And also, specifically, his mother testified that one of her boyfriends, Mr. Willie McGee, had Mr. Presnell stand naked in front of, or excuse me, stand in front of the family naked with his daughter and had them look at each other to prevent their future curiosity. And that was presented to? At trial. At trial. At trial. At trial, I'm not talking about the state collateral proceeding. Was there any expert testimony presented that all of that could have contributed to either his pedophilia or to his inability or lack of desire to control his pedophilia and to control the violent criminal actions? Yes, Your Honor. That was presented by Dr. Schaffer, that all of this combined is what made him who he was at the time of the crime, that it explained his behavior and that trial counsel argued in their closing arguments that he was programmed differently, that he came from a different background, that he came from a family where abuse was present. And the State Habeas Court took all of that into account in its prejudice analysis, as well as the affidavits at the State Habeas proceeding and determined that there was no reasonable probability of a different outcome. Furthermore, Your Honor, even had trial counsel submitted this alleged revelation by Mrs. Samples about her prenatal binge drinking, there's no evidence that Dr. Schaffer or any mental health expert would have diagnosed Mr. Presnell with fetal alcohol syndrome. Specifically, Dr. Weinstein himself says that all the evidence points to the fact that this is consistent with fetal alcohol spectrum disorder. And he never specifically diagnoses him with fetal alcohol syndrome. Moreover, he describes fetal alcohol spectrum disorder as a subset of fetal alcohol syndrome and not fetal alcohol syndrome itself. And as part of fetal alcohol syndrome, the definition includes having abnormal facial structures and skull structures. And Mr. Presnell was described in his school records as a handsome youngster, and his photographs were also submitted into evidence at trial, which would have been available to the jurors to look at to determine for themselves whether he met that definition that would have been offered by any mental health expert. Furthermore, Your Honor, I'd just like to add, Mr. Presnell mentioned that Dr. Lysak reported that the shame is deep, and that's why he didn't report any sexual molestation that he may have suffered. I reviewed the record. I didn't see anything about Mr. Lysak determining that the shame was deep. I did see that he said that Mr. Presnell did not report any sexual molestation, but in his opinion, the history supported sexual molestation. Thank you. Also, Your Honor, you asked Mr. Presnell's counsel whether Ms. Samples said, or what she reported in her deposition regarding her binge drinking to Ms. Beauvais. In her deposition, which is contrary to what Ms. Samples, excuse me, Ms. Beauvais reported to trial counsel, Ms. Samples said in her deposition that no one asked her about any of her drinking. That is original trial counsel, resentencing trial counsel, Ms. Beauvais, or anyone else, and that, again, is contradicted by the record. So, Your Honor, if there are no further questions, I would just ask that this court affirm the district court's denial of relief and hold that the state habeas court's decision was not unreasonable. Thank you, counsel. Mr. King. Just to work back to front, I'm not contending that Dr. Lesak tried to make some kind of assessment of comparative shame in terms of Mr. Presnell's remorse for the crimes he committed and Dr. Lesak's belief that he was likely to be molested. That's my attempt to respond to your question from earlier about whether there's an inconsistency there. And we are not disputing and have never disputed that a great deal of evidence of the sexual dysfunction in Mr. Presnell's childhood came in, just as, in fact, a great deal of evidence that would indicate, had it been recognized as such, organic brain damage came in. What is missing is the understanding of the fetal alcohol spectrum disorder and the impact that that had for both components of this. Yes, sir. I thought, and I just want to ask you, I thought that one of the experts did some exams that should have shown up, should have shown organic brain disease or disorder, disease, if it had existed. Am I wrong about that? Your Honor, I'm just not sure. I'm not sure what you mean. I can run down who did what, if that's helpful. No, I... Dr. Schaefer did a, did four subtests from the house to the right hand, two of which indicated brain dysfunction. But as he says in his testimony, neuropsychological testing is only done when there's evidence of a brain injury. And he did not do a full neuropsychological battery, as Dr. Weinstein did, after learning of the prenatal alcohol exposure. Now, in state habeas, there's both the full neuropsychological battery that Dr. Weinstein does, along with a number of other tests, which I can enumerate. There's also the EEG, which confirms damage to Mr. Presnell's frontal lobes and dysfunction in that area, which, as we know, is a category of mitigating evidence that the Supreme Court has recognized again and again. And, of course, in Rumpia, they recognize organic brain damage from FASD as mitigating. So, I mean, I want to make sure that the overall theme of what we are saying gets across. The first is that this is mitigating in and of itself, but also that this is, Dr. Schaefer, in his testimony, and many people discussed the medication, talk about puzzles. This was the missing piece. This is the piece that both explains and corroborates and is corroborated by the evidence that the jury did hear about brain dysfunction, the evidence the jury did hear about the development of the pedophiliac disorder. There is a world of difference, I would submit, between he's in this childhood environment, which can cause pedophilia if you're vulnerable to it, and I think there's a vulnerability because of a genetic predisposition based on this uncle, who, it turns out, does not start molesting anyone until he suffers a head injury. I understand your point from earlier, Honor, that at the very least muddies citing that as genetic ideology, and Dr. Schaefer cited it, evidently not knowing that Uncle James is molesting and only begun after the car accident. So, FASD is the piece that explains, corroborates, and is corroborated by what this, both of these categories of evidence. The fetal alcohol spectrum is the organic brain injury that limits his ability to control his behavior, which has damaged his judgment so profoundly, and also how he is so vulnerable to the development of this pedophiliac disorder. Putting aside the obvious point that child molestation is a violent crime in the sense of the harm it does and other aspects, was there any indication, I'm thinking now of him drowning the little 8-year-old girl, which is why we're here, is there any indication that there was a violent crime history in his family? In his family? Yeah, Uncle James, for example, or anybody else. I mean, there is, I want to make sure that I don't misspeak, there is certainly a violent history in Uncle James that follows. There's very violent molestations, there's forced incest between his wife and son, there's really some horrible stuff in there. In terms of a violent criminal history among other members of his family, I don't know. I'm talking about, we've got a murder case. Yes, sir. Is there any indication that anybody in the family has ever assaulted with, other than molestation, are shot or stabbed or drowned or strangled anybody? Not to my knowledge, Your Honor. I'm very happy to check the affidavits and the records, and I'll be glad to supplement on that point. The mother certainly didn't say anything about it in her affidavit. I've read that twice. Yes, yes. No, the mother does not say anything about that. And again, we've discussed what Lois conveys, Ms. Presnell, Ms. Samples, conveys about the drinking that she did and what representations that she made to counsel about that. I mean, I do want to underscore again, we are talking about red flags. The only thing that we can know for certain that socially means is yes. Did you drink during your pregnancy? I did not drink except socially. Socially is yes. That is a red flag. And there is plenty of Supreme Court authority on the premise that even if you think a family member is not being cooperative with you, and candidly, I don't think there's anything in the record to suggest that Ms. — that Ms. Samples wasn't answering the questions that she was asked very openly and candidly, then you still have to delve into the facts. Feral in this Court, you know, when you have a — if you need to delve into the facts, you have to ask the follow-up questions. And that is what did not happen here. I don't think you need any particular scientific expertise to perceive the need for that in any category of mitigation. When you're talking about whether it's occurred, you need to know intensity and frequency. And I'm so attuned at this point to the movement of your jaw, I'm stopping talking and apologize. I didn't want to interrupt your last 30 seconds. So if you've got something to say, I'll save my question. I couldn't possibly remember. Yes, sir. What did you want to ask? I recall a case that I wrote. It was the American Gothic case. You may be familiar with it, in which they ask the father, did you physically abuse the petitioner? Oh, no, no, no. And they didn't ask anyone else. And then the record conclusively shown, if they had asked anybody else, neighbors, friends, family members, all of them would have said, oh, yes, he beat him unmercifully, etc., etc. But as I understand the record, and tell me if I'm wrong, nobody else would have said she binge drank during pregnancy. Am I wrong about that? Tell me who all would have said that. Well, I think by the nature of the drinking that she describes, she is the source of it. I'm sorry. Am I? Yeah, of course. But she denied it. I'm trying to put her in the position of the father who abused his son. Didn't want to tell anybody. Maybe she didn't want to. I saw the social, just drank socially, that maybe she's covering it up because she's embarrassed about it. And he's in trouble now, and she may be the source of it. So she says no. If they had asked other family members, what's your best evidence, the other family members or friends or neighbors would have said, yeah, she drank like a fish or she drank a lot or I saw her with bourbon in her hand during her pregnancy, etc. Is there anything like that in the record? It's not in the record, Your Honor. What Ms. Samples describes is, you know, sitting, she is out carousing with Delano, but what she describes in the record is sitting at home waiting for him to come back. And she is the only source there. I do think it's important, though, that, again, she's not denying that she drank. She's admitting that she drank during her pregnancy. Now, whether, for whatever reason she had for giving the answer that she gave, which is an ambiguous answer, I would contend, and that you can't evaluate apart from the context of that particular person what their social mores and practices are. But she answers yes, and there are no follow-up questions. So, again, did you drink during your pregnancy? Yes. And that's the end of the story. You know, it hadn't been that long ago, or maybe it has, and I've just lost track of time, in which the medical community didn't say thou shall not drink. It said for a while, drink in moderation if you have to, and then it was one glass a day, and then it got to be one a week or something like that, and then the flat ban fell. So I'm not sure what the advice was at the time she said that. I think we have some information, actually, in one of the reports about sort of the evolution of understanding of FASD, but certainly I think the broken cord came out in 1988, and I know that by 1996 there are some pretty dispositive studies about the deleterious effect. So when she's having that conversation, indeed, there is prior to the resentencing trial in 1999, it's known that it's dangerous and damaging. Okay. Thank you. We'll take that case under submission. Thank you, Your Honor. Thank you.